UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


PRESTON PORTIS, JR.,

        Plaintiff,

vs.

PATRICIA CARUSO, *et al.*,

        Defendants.

_____/

Case No. 1:09-cv-846

Hon. Robert J. Jonker

## REPORT AND RECOMMENDATION

This is a civil rights action brought by a former state prisoner pursuant to 42 U.S.C. § 1983. This matter is now before the court on the following motions:

1.      "Defendant Scott Burgess, M.D.'s motion to dismiss pursuant to FRCP 12(b)(6) in lieu of filing an answer to plaintiff's complaint" (docket no. 23);

2.      "Defendants William Nelson, M.D. and Donna Rohrs' Motion to dismiss (docket no. 35);

3.      "Defendants' Motion for summary judgment" filed by Patricia Caruso, Haresh Pandya, John Prelesnik and Ephraim Habtemariam (docket no. 36); and

4.      Defendant Correctional Medical Services' Motion to dismiss" (docket no. 45).

### I.    Background

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim,

a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

Plaintiff has filed a 24-page complaint naming 13 defendants: Michigan Department of Corrections (MDOC) Director Patricia Caruso; Correctional Medical Services, Inc. (CMS); an unknown party identified as a Michigan Training Unit (MTU)Control Center Sergeant [recently identified as Sgt. R. Czech]; MTU Warden John Prelesnik; Dr. Haresh Pandya, MDOC's Region II Medical Officer; Dr. Zafar Iqbal; Dr. Scott D. Burgess; R.N. Sherri Gregurek; R.N. Sherry Rowland; P.A. Donna Rohrs; R.N. Ephraim Habtemariam;[1] R.N. James C. Bates; and Dr. William Nelson. Plaintiff has not yet served the following defendants: Sgt. Czech; Dr. Iqbal; R.N. Gregurek; R.N. Rowland; and R.N. Bates.

### A.     Plaintiff's allegations

Plaintiff sets forth the following allegations, which arise from: an injury to the fifth digit of his right hand (pinky finger) which occurred while playing softball on June 30, 2006; plaintiff's transfer from MTU to ICF; an injury to the third finger of his right hand (middle finger) which occurred while lifting weights on May 13, 2008; and defendants' failure to provide him with adequate pain medication.

### 1.     The first injury in 2006

"On the30th day of June 2006, while playing softball at MTU, plaintiff's small finger, 5th digit, was struck by the ball and his finger became immediately swollen, with a bone dislocated, pushing against the skin near the first joint of the finger causing significant bleeding and pain."

---

[1] The court notes that R.N. Habtemariam is named on the docket sheet as "Efram Habitarnarum."

Compl. at ¶ 16 (docket no. 1). Nurse Julie Flecther [sic] of the MTU Health Services determined that plaintiff had an emergency due to the swollen finger and plaintiff's "accelerated vital signs" and sent plaintiff to the control center for transportation to the hospital (ICMH). *Id.* at ¶ 17. The Control Center Sgt. Czech determined that plaintiff could ride with another prisoner to ICMH. *Id.* at ¶ 18. After one hour it was determined that the other prisoner did not require emergency treatment, so plaintiff was transported to ICMH. *Id.* The attending physician at ICMH "was aware plaintiff required surgery to repair his finger but elected not to treat these aspects of plaintiff's injuries." *Id.* at ¶ 23. As a result, the tendon and ligament in plaintiff's finger have never been surgically repaired "resulting in a permanent gross deformity, [loss] of considerable dexterity and substantial pain." *Id.* Dr. Iqbal provided specific instructions to MTU Health Services, "i.e., to remove the boxing glove splint the following day 7/1/06, replace with a regular splint, and check finger coloration." *Id.* at ¶ 25. Dr. Iqbal also determined that plaintiff "should be examined at his office, within 8 to 10 days, to ascertain the extent of surgery necessary for 'need to open repair, need for repair of the center clip of the extensor tendon or partial rupture of the radial collatera ligament might arise later on [sic].' " *Id.* at ¶ 27. The splint was removed seven days later (July 6th), but a regular splint was not placed on the finger until July 7th. *Id.* at ¶ 32. R.N. Sherri Gregurek recorded Dr. Iqbal's instructions but did not schedule plaintiff for a health care appointment to remove the boxing glove splint, monitor coloration, circulation and pain. *Id.* at ¶ 26. Defendants Dr. Pandya, R.N. Gregurek, R.N. Rowland and P.A. Rohrs' failure to schedule a follow-up appointment or to follow Dr. Iqbal's orders to change the splint and check circulation caused plaintiff's finger to be permanently deformed, lose dexterity and be painful. *Id.* at ¶ 29.

Due to plaintiff's complaints of pain, P.A. Rohrs ordered x-rays to be taken on August 31, 2006. *Id.* at ¶ 33. At that time, Rohrs noted "the presence of an avulsion fracture and soft tissue swelling" but "did nothing to treat the injured finger." *Id.* After plaintiff made continued complaints of "pain, deformity and lost [sic] of dexterity," P.A. Rohrs ordered another x-ray, taken on September 29, 2006, and ordered calcium carbonate treatment after "arriving at the identical conclusion." *Id.* at ¶ 34. Because the calcium carbonate treatment is not part of CMS' formulary, Dr. Pandya had to approve the medication. *Id.* at ¶ 35. Dr. Pandya denied the formulary, without examining plaintiff's hand, relying "upon the paperwork submitted" which was "in error or had not reflected an accurate and real time [diagnosis]." *Id.* at ¶ 36. Under these circumstances, CMS' procedure was "constitutionally flawed because it evolved into a reckless disregard and medical deliberate indifference to a medical need." *Id.* Dr. Pandya knew or should have known that the rupture and ligament damage required surgery, based upon Dr. Iqbal's initial diagnosis, and should have "ordered timely and adequate medical care for plaintiff's injury." *Id.* at ¶ 37. CMS knew or should have known that it had not provided adequate health care personnel which resulted in untimely and inadequate treatment for plaintiff's injury. *Id.* at ¶ 38. In addition, CMS did not make an appointment with a hand specialist until approximately 4 1/2 months after the injury. *Id.* at ¶ 40.

Plaintiff's only allegations against Dr. Burgess are: that he is a doctor and hand specialist employed at the Michigan Hand Center in Grand Rapids; that he had an appointment with plaintiff about 4 1/2 months after the injury; and that the doctor concluded that plaintiff did not need surgery. *Id.* at ¶¶ 9, 39-40 and 42. Finally, plaintiff alleged that Director Caruso is that she "well aware" of CMS' "deficiencies," but that she has "refused to sufficiently monitor" the health care provided by CMS. *Id.* at ¶¶ 47-48.

## 2.      The transfer to ICF

Plaintiff alleged that he filed grievances regarding the inadequate health services. *Id.* at ¶¶ 49-50. MTU Warden Prelesnik addressed one of plaintiff's grievances and "upon answering plaintiff's grievance, plaintiff was transferred from MTU to ICF." *Id.* at ¶ 51. Plaintiff asserts that this transfer was in violation of his First and Fourteenth Amendment right to petition the government to air grievances. *Id.* at ¶¶ 52-57.

## 3.      The second injury in 2008

On May 13, 2008, plaintiff injured the third digit on his right hand while lifting weights. *Id.* at ¶ 58. Plaintiff believes that this injury, which he refers to as an accident, "was due to the prior injury of the fifth digit on the right hand which rendered his right hand considerable weaker [sic]." *Id.* When plaintiff contacted the unit officer at 20:20 hours (8:20 p.m.) about the injury, R.N. Habtemariam advised the officer that he was running the med lines for level five prisoners, that his shift was about to end, that he did not have time to treat plaintiff and that plaintiff should wait until the next day for treatment. *Id.* at ¶ 59. Plaintiff was not seen until 21:37 hours (9:37 p.m.) (i.e., 1 hour and 17 minutes later) when R.N. Bates had plaintiff escorted to health services from the housing unit. *Id.* at ¶ 61. Plaintiff saw R.N. Habtemariam at health services at that time "not running a med line and not on his way out the building." *Id.* at ¶ 62. As a result of the weight lifting injury, plaintiff sustained a five centimeter cut and lost a considerable amount of blood. *Id.* at ¶ 63. R.N. Bates cleaned the wound, placed a dressing and splint on the wound and told plaintiff that he would be seen by the doctor the next morning. *Id.* Plaintiff asserts that Bates was "covering up" for Habtemariam's "unprofessional behavior" and did not use sutures to close the wound. *Id.* at ¶ 64.

Plaintiff was not called to health services the next day, so he had the unit officer call R.N. Bates to dress his injury. *Id.* at ¶ 65. R.N. Bates placed plaintiff on health services call-out for x-rays on May 15, 2008. *Id.* at ¶ 66. After having the x-rays taken, plaintiff asked defendant Dr. Nelson why he had not been placed on call to examine the injury. *Id.* Dr. Nelson replied that he had read the report and subsequently examined the injury. *Id.* The doctor determined that the laceration required two stitches, but due to the time lapse (two days) placed butterfly band aids on the wound to close it. *Id.* at ¶ 67. The x-rays did not show an abnormality according to the radiologist, but Dr. Nelson read the x-ray and observed bone fragments. *Id.* at ¶ 68. By May 17, 2008, Dr. Nelson knew or should have known that plaintiff's finger had torn tendons and ligament damage which required surgery. *Id.* at ¶ 69. Nine months after plaintiff suffered the injury, Dr. Nelson referred him to a hand specialist, Dr. Mark R. DeHaan, who determined in February of 2009 that plaintiff required surgery to repair the tendon and ligament damage. *Id.* at ¶ 76.

### 4. Pain medication

Plaintiff alleged that the Tylenol prescribed did not adequately address the pain he experienced and made repeated requests for stronger pain medication to defendants Dr. Nelson, R.N. Gregurek, R.N. Rowland, P.A. Rohrs, R.N. Habtemariam and R.N. Bates. *Id.* at ¶ 71. Plaintiff made requests in May, June and July of 2008 and January of 2009. *Id.* at ¶¶ 71-74.

### B. Relief sought

Plaintiff seeks over two million dollars in compensatory and punitive damages for violations of his First, Eighth and Fourteenth Amendment rights.

### III. Defendants' motions to dismiss (docket nos. 23, 35 and 45)

#### A. Legal Standard

Defendants Dr. Burgess, Dr. Nelson, P.A. Rohrs and CMS seek to dismiss plaintiff's action pursuant to Fed. R. Civ. P. 12(b)(6).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (internal citations omitted). In making this determination, the complaint must be construed in the light most favorable to the plaintiff, and its well-pleaded facts must be accepted as true. *Morgan v. Churchs Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. National Collegiate Athletic Association*, 528 F.3d 426, 430 (6th Cir. 2008).

#### B. Failure to exhaust

##### 1. Exhaustion requirement

The Prison Litigation Reform Act ("PLRA") 42 U.S.C. § 1997e, provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust available administrative remedies, even if

the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741. In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Jones v. Bock*, 549 U.S. 199, 218 (2007); *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218.

Defendant CMS has moved to dismiss this action for lack of exhaustion. "[A] prisoner's failure to exhaust under § 1997e(a) is an affirmative defense on which the defendant bears the burden of proof." *Vandiver v. Correctional Medical Services, Inc.*, 326 Fed. Appx. 885, 888 (6th Cir. 2009), citing *Jones*, 549 U.S. at 217-220. A defendant can raise affirmative defenses in a motion to dismiss. *See, e.g., Jackson v. Schultz*, 429 F.3d 586, 589 (6th Cir. 2005) (defendant could properly raise the affirmative defense of qualified immunity "based on a pre-answer motion to dismiss"); *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003) ("Like other Rule 12(b)(6) motions to dismiss, a motion to dismiss on statute of limitations grounds should be granted when the statement of the claim affirmatively shows that the plaintiff can prove no set of facts that would entitle him to relief. A court that is ruling on a Rule 12(b)(6) motion may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice.") (internal quotation marks and citations omitted).

It is appropriate for defendants in a prisoner civil rights action to raise the affirmative defense of failure to exhaust administrative remedies in a motion to dismiss. *Bryant v. Rich*, 530 F.3d 1368, 1374-75 (11th Cir.), cert. denied 129 S. Ct. 733 (2008). "Because exhaustion of

administrative remedies is a matter in abatement and not generally an adjudication on the merits, an exhaustion defense [under the PLRA] . . . is not ordinarily the proper subject for a summary judgment; instead, it should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment." *Id.* (internal quotation marks omitted).

The MDOC grievance procedure is an administrative review regulated by the agency's Policy Directives. This court may take judicial notice of plaintiff's grievance filings in this state agency proceeding for purposes of deciding a motion to dismiss. *See Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008) (a court may consider public records without converting a Rule 12(b)(6) motion into a Rule 56 motion, but may only take judicial notice of facts which are not subject to reasonable dispute); *Marshek v. Eichenlaub*, No. 07-1246, 2008 WL 227333 at *1 (6th Cir. Jan. 25, 2008) (court can take judicial notice of prisoner's transfer as shown in the Bureau of Prison's Inmate locator accessed on the agency's official website); *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2nd Cir. 1991) ("[w]here plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated"); *Walker v. Woodford*, 454 F.Supp.2d 1007, 1021-23 (S.D.Cal. 2006) (the Court may consider a limited set of documents without converting a Rule 12(b)(6) motion into a motion for summary judgment, including matters that can be judicially noticed; documents pertaining to the prisoner's exhaustion efforts "are part of a state administrative proceeding and may be judicially noticed, not for the truth of their contents but for the fact that the grievance proceeding occurred"); *Eggerson v. United States*, 1: 05-cv-594, 2006 WL 1720252 at *3 (W.D. Mich. June 22, 2006) ("In ruling on a motion under Rule 12(b)(6), the court may supplement the facts alleged in the pleadings

by considering facts susceptible to judicial notice under Fed.R.Evid. 201"); *Walker v. Abdellatif*, No. 1:07-cv-1267, 2009 WL 579394 (W.D. Mich. March 5, 2009) (taking judicial notice of MDOC prisoner grievance proceedings in deciding motion to dismiss for lack of exhaustion); *White v. Correctional Medical Services, Inc.*, No. 1:08-cv-277, 2009 WL 596473 (W. D. Mich. March 6, 2009) (same).

Taking judicial notice of a prisoner's administrative grievance proceeding is consistent with the purpose of the PLRA's "invigorated" exhaustion provision, which Congress enacted to control the "sharp rise in prisoner litigation in the federal courts." *Woodford*, 548 U.S. at 84. One reason for creating prisoner grievance procedures under the PLRA was to create an administrative record for the court.

> Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record.

*Jones*, 549 U.S. at 204.

## 2.    MDOC grievance process

The MDOC requires prisoners to follow a three-step process to exhaust grievances. *See* Policy Directive 03.02.130.[2] A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the giveable issue, unless prevented by circumstances beyond his or her control. If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to

---

[2] Plaintiff complains of medical treatment received in June 2006 and from May 2008 through February 2009. Three different versions of this policy directive applied during the course of that treatment with effective dates as follows: December 19, 2003; March 5, 2007; and July 9, 2007. While the lettering of the paragraphs in the three versions is not identical, and slight variations occur, each of the policy directives contain the basic requirements outlined in this report.

resolve the issue with appropriate staff.   The Policy Directive provides the following directions for completing grievance forms:

> The issues shall be stated briefly but concisely.  Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how).  Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ R (emphasis in original).[3]   The prisoner must send the Step I grievance to the appropriate grievance coordinator.   If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator.   Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the appropriate MDOC official.

### 3.    Plaintiff's grievances pursued through Step III

The record reflects that plaintiff filed four grievances exhausted through Step III while incarcerated at MTU: MTU-2006-04-514-08h ("514"); MTU-2006-05-598-17a ("598"); MTU-2006-04-533-23z ("533"); and MTU-2006-07-835-27b ("835").   *See* Exhs. B, C, D and E attached to CMS' Brief (docket nos. 45-4, 45-5, 45-6 and 45-7).   The first three grievances do not relate to health care issues (no. 514 grieves the calculation of plaintiff's sentence; no. 598 grieves the school principal for not allowing him to use the restroom;  and no. 533 grieves that his telephone list is not being properly maintained).   The only grievance that arguably pertains to plaintiff's claims is no. 835, which complains that certain members of the correctional facility's staff took too long to take him to the hospital when he injured his finger on June 30, 2006.   CMS is not named in this

---

[3] The quoted section, which appears in the July 9, 2007 version of the policy directive is nearly identical to the previous versions; the differences between the versions are of no significance for the purpose of this report.

grievance. Accordingly, plaintiff has not properly exhausted a grievance against CMS with respect to his claim arising from the June 30, 2006 injury sustained at MTU.

The record reflects that plaintiff filed four grievances exhausted through Step III while incarcerated at ICF: ICF-2007-08-1608-12F3 ("1608"); ICF-2008-05-1181-12E3 ("1181"); ICF-2008-1775-12D1 ("1775"); and ICF-2007-10-1994-12e1 ("1994"). *See* Exhs. F, G, H and I attached to CMS' Brief (docket nos. 45-8, 45-9, 45-10 and 45-11). Grievance no. 1608 does not relate to injuries at issue in this action, grieving untimely issuance of cholesterol medication. Grievance nos. 1181 and 1775 complain about the untimely treatment for the 2008 injury sustained to the third finger of plaintiff's right hand. While both grievances complain about the actions of various health care providers, neither grievance mentions CMS or complains about actions undertaken by CMS.

The court, however, disagrees with CMS regarding grievance no. 1994. This grievance involves an incident date of October 10, 2007, and complains that CMS and others cancelled his scheduled surgery to repair his right pinky finger, which had been injured on June 30, 2006. The MDOC officials addressed the surgery issue and related treatment in the grievance responses at Steps I, II and III.

The only claim that plaintiff has properly exhausted against CMS is that the corporation failed to authorize surgery in 2007 to repair his right pinky finger. Accordingly, CMS' is entitled to dismissal of all of plaintiff's claims for lack of exhaustion, with exception of this alleged failure to authorize surgery.

## C. Failure to state an Eighth Amendment claim against CMS

CMS asserts that plaintiff has failed to state a claim against it for deliberate indifference. It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (l976). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Hudson*, 503 U.S. at 8-9. With respect to the infliction of serious pain, courts recognize that "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* at 8 (internal citations and quotation marks omitted). Similarly, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

Plaintiff's complaint fails to "state a claim to relief that is plausible on its face" against CMS. *Iqbal*, 129 S. Ct. at 1949. It is well established that "[a] defendant cannot be held liable under section 1983 on a respondeat superior or vicarious liability basis." *Street v. Corrections Corporation of America*, 102 F.3d 810, 818 (6th Cir. 1996), citing *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). A plaintiff who sues a private or public corporation for constitutional violations under 42 U.S.C. § 1983 must establish that a policy or custom caused the alleged injury. *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998); *Street*, 102 F.3d at 818. The Sixth Circuit has held that like a municipal corporation, "CMS's liability must also be premised on some policy that caused a deprivation of [a prisoner's] Eighth Amendment rights." *Starcher v. Correctional Medical Systems, Inc.*, 7 Fed. Appx. 459, 465 (6th Cir. 2001). Thus, in order to state a § 1983 claim against CMS, plaintiff "must allege the existence of a policy, practice or custom that resulted in the injury." *Moreno v. Metropolitan General Hosp.*, No. 99-5205, 2000 WL 353537 at *2 (6th Cir. March 28, 2000). *See Bartalone v. Berrien County*, 643 F. Supp. 574, 578-79 (W.D. Mich. 1986); *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). "It is not enough for a complaint under § 1983 to contain mere conclusory allegations of unconstitutional conduct by persons acting under color of state law. Some factual basis for such claims must be set forth in the pleadings." *Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir. 1986).

Here, plaintiff alleged that CMS had a policy which "shows a proclivity for inadequate and untimely medical care resulting into deliberate indifference, violative of the Eighth Amendment." Compl. at ¶ 46. Plaintiff's complaint, however, is limited to an alleged difference of opinion between CMS and Dr. Iqbal regarding the treatment of his right pinky finger. Plaintiff has not alleged sufficient factual matter to establish the probable existence of a CMS policy to provide "inadequate and untimely medical care" or to "state a claim to relief that is plausible on its face" for violation of such an alleged policy. For this reason, his complaint should be dismissed.

Furthermore, even if plaintiff had alleged such a policy, he has not alleged deliberate indifference. At most, plaintiff has alleged a disagreement between MDOC medical staff, CMS and a non-MDOC physician regarding the proper treatment for his finger. The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976). This action falls in the latter category. "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id. See Owens v. Hutchinson*, 79 Fed. Appx. 159, 161 (6th Cir. 2003) ("[a] patient's disagreement with his physicians over the proper medical treatment alleges no more than a medical malpractice claim, which is a tort actionable in state court, but is not cognizable as a federal constitutional claim"). Accordingly, the court should grant CMS' motion

to dismiss plaintiff's exhausted claim with respect to the alleged failure to surgically treat the injury to his right pinky finger.[4]

### D.    Dr. Burgess

Plaintiff does not allege that Dr. Burgess was a prison official, that he was an MDOC employee or that he served any function in the state prison system.[5]  Rather, plaintiff alleged that Dr. Burgess was a hand specialist who examined plaintiff about 4 1/2 months after his June 30, 2006 injury and that the doctor did not recommend surgery.  Plaintiff's claim is strictly one for medical treatment by an off-premises doctor.  There is no allegation that Dr. Burgess was exercising powers particularly reserved to the state.  *See, e.g., Rudy v. Village of Sparta*, 990 F. Supp. 924, 930-31 (W.D. Mich.1996) (holding that private physicians cannot be liable under section 1983 for ordering emergency medical procedures based upon their independent medical judgments).  Similarly, there is no allegation that Dr. Burgess was "compelled" to work for the state or that a "symbiotic relationship" existed between the state and the doctor.  Given the mere allegations that Dr. Burgess was an outside hand specialist who provided a consultation with respect to plaintiff's right pinky injury, the doctor cannot be considered a state actor for purposes of liability under § 1983.  *See, e.g., Ketola v. Clearwater*, No. 1:08-cv-31, 2008 WL 4820499 at *2-3 (W.D. Mich. Oct. 31, 2008) (in granting motion to dismiss, court reasoned that even if defendant hospital and a treating physician at the hospital "treated [the prisoner plaintiff] at the state's request and expense, they did not thereby

---

[4] The court disagrees with CMS' contention that plaintiff's claim is untimely.  The statute of limitations for a § 1983 claim in Michigan is three years, based upon Michigan's three-year statute of limitations for injury to a person or property, M.C.L. § 600.5805(10).  *Chippewa Trading Company v. Cox*, 365 F.3d 538, 543 (6th Cir. 2004).  While plaintiff's injury occurred in June 2006, the matter he grieved (i.e., the cancellation of surgery) allegedly occurred in September 2007. This action, which was filed on September 11, 2009, fell within the three year statute of limitations.

[5] Plaintiff sometimes refers to Dr. Scott Burgess as "defendant Scott."

become state actors"). Plaintiff has not alleged any federal constitutional claim against Dr. Burgess, and Dr. Burgess' motion to dismiss should be granted.[6]

### E.    Dr. Nelson and P.A. Rohr

Dr. Nelson and P.A. Rohr have moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(5) for insufficient service of process. In such cases, the plaintiff bears the burden of proving that proper service was effected. *Aetna Business Credit, Inc. v. Universal Decor & Interior Design, Inc.*, 635 F.2d 434, 435 (5th Cir. 1981); *Frederick v. Hydro-Aluminum S.A.*, 153 F.R.D. 120, 123 (E.D. Mich.1994). The court may construe a motion to dismiss for ineffective service of process as a motion to quash service. *See Young's Trading Company v. Fancy Import, Inc.*, 222 F.R.D. 341, 342-43 (W.D. Tenn. 2004) ("[w]here service is ineffective, a court has discretion to either dismiss the action or quash service and retain the case") (citing *Haley v. Simmons*, 529 F.2d 78, 79 (8th Cir.1976)). The Sixth Circuit has expressed a preference for treating the first motion for improper service as a motion to quash. *See Stern v. Beer*, 200 F.2d 794, 795 (6th Cir. 1953) ("if the first service of process is ineffective, a motion to dismiss should not be granted, but the case should be retained for proper service later"). *See also, Daley v. ALIA*, 105 F.R.D. 87, 89 (E.D. N.Y.1985) ("[w]hen the gravamen of defendant's motion is insufficiency of process, however, the motion must be treated as one to quash service, with leave to plaintiffs to attempt valid service").

Fed. R. Civ. P. 4(e) provides for the service of a summons on an individual defendant as follows:

---

[6] Even if plaintiff had alleged that Dr. Burgess was a state actor, his Eighth Amendment claim would fail. Plaintiff faults the doctor for failing to recommend surgery. This type of claim alleges no more than negligence. Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Farmer*, 511 U.S. at 835.

Unless federal law provides otherwise, an individual--other than a minor, an incompetent person, or a person whose waiver has been filed--may be served in a judicial district of the United States by:

(1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made; or

(2) doing any of the following:

(A) delivering a copy of the summons and of the complaint to the individual personally;

(B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or

(C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Fed. R. Civ. P. 4(e).

The applicable Michigan Court Rule, MCR 2.105(A), provides the following method

for serving an individual defendant:

Process may be served on a resident or nonresident individual by

(1) delivering a summons and a copy of the complaint to the defendant personally; or

(2) sending a summons and a copy of the complaint by registered or certified mail, return receipt requested, and delivery restricted to the addressee. Service is made when the defendant acknowledges receipt of the mail. A copy of the return receipt signed by the defendant must be attached to proof showing service under subrule (A)(2).

MCR 2.105(A). Michigan law allows for service on an agent under certain circumstances:

(1) Service of process on a defendant may be made by serving a summons and a copy of the complaint on an agent authorized by written appointment or by law to receive service of process.

(2) Whenever, pursuant to statute or court rule, service of process is to be made on a nongovernmental defendant by service on a public officer, service on the public officer may be made by registered mail addressed to his or her office.

MCR 2.105(H).

In this case, the Marshals Service attempted to serve these two defendants by mailings to the following addresses:

> Correctional Medical Services, Inc.
> C/O The Corporation Company
> Donna Rohrs
> 30600 Telegraph Road
> Bingham Farms, MI 49025

> Correctional Medical Services, Inc.
> C/O The Corporation Company
> William Nelson
> 30600 Telegraph Road
> Bingham Farms, MI 49025

*See* Acknowledgment of Service (docket nos. 34 and 35-2). The certified mailing return receipt card for each defendant is signed by the "The Corporation Company." *Id.* Given that each card includes the name of a defendant corporation (CMS), a company (The Corporation Company) and an individual defendant, and that neither of the individual defendants signed the card, plaintiff has the burden to show that the signatory (The Corporation Company) is an agent for the individual defendants (P.A.Rohrs and Dr. Nelson). In his response, plaintiff has presented a copy of correspondence from a "CT Corporation" to the United States Marshals Service, in which CT Corporation identified itself as a statutory agency for The Corporation Company. This is irrelevant to this litigation. *See* docket no. 41-2. Nothing in the record indicates that CT Corporation had any role in the service or acceptance of defendants' summonses.

Based on this record, plaintiff has not met his burden to demonstrate that defendants Rohrs and Nelson have been properly served under Fed. R. Civ. P. 4. However, dismissal of these defendants is not an appropriate remedy. Plaintiff, as a *pro se* prisoner proceeding *in forma pauperis*, has relied on the Clerk's Office and the United States Marshals Service to effect service of process on defendants. *See* 28 U.S.C. § 1915(d); Fed. R. Civ. P. 4(c)(2). As the court observed in *Johnson v. Williams*, No. 05-2315 (RBW), 2006 WL 2788985 (D. D.C. Sept. 26, 2006):

> Generally, *pro se* plaintiffs who depend on Court officers should not be penalized for a court officer's failure or mistake in properly effecting service of process. *See Mondy v. Secretary of the Army*, 845 F.2d 1051, 1060 (D.C. Cir.1988) (MacKinnon, J. concurring). Deference to plaintiffs' *pro se* status, however, cannot justify the exercise of jurisdiction over defendants who have not been served properly.

*Johnson*, 2006 WL 2788985 at *3.

Under the circumstances of this case, the court views defendants' motion as one to quash service of process rather than as one to dismiss. *See Haley*, 529 F.2d at 79; *Stern*, 200 F.2d at 795; *Young's Trading Company*, 222 F.R.D. at 342; *Daley*, 105 F.R.D. at 89. Accordingly, defendants' motion should be granted. However, plaintiff should be allowed another attempt to properly serve defendants. *Id.*

## IV. Defendants' motion for summary judgment (docket no. 36)

### A. Legal Standard

Defendants MDOC Director Caruso, Dr. Pandya, Warden Prelesnik and R.N. Habtemariam have moved for summary judgment on various grounds. Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(c). In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the standard for deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B.     Lack of Exhaustion

Director Caruso, Dr. Pandya and Warden Prelesnik have moved for summary judgment for lack of exhaustion. The court has previously identified the eight exhausted grievances and set forth the legal requirements for proper exhaustion. *See* discussion in § III.B., *supra*. The court's discussion of those grievances and the legal requirements for exhaustion apply with equal force to these three defendants.

### 1. Warden Prelesnik

Plaintiff alleged that Warden Prelesnik retaliated against him by transferring plaintiff from MTU to ICF. None of the eight grievances name Warden Prelesnik. For this reason, plaintiff has failed to properly exhaust a grievance against the warden with respect to the alleged retaliatory transfer or any other claim raised in his complaint. *See Jones*, 549 U.S. at 218-19; *Woodford*, 548 U.S. at 90-93. Plaintiff has failed to properly exhaust any grievances against the warden. Warden Prelesnik should be granted summary judgment for lack of exhaustion.

### 2. Director Caruso

Plaintiff alleged that Director Caruso was aware of CMS' deficiencies, but that she has "refused to sufficiently monitor" the health care provided by CMS. The only grievance which names Director Caruso is no. 1994, which, as previously discussed, complained about the alleged cancellation of his 2007 surgery to repair his right pinky finger. The MDOC officials addressed that surgery and related treatment in the grievance responses at Steps I, II and III. Plaintiff has properly exhausted his claim against Director Caruso only with respect to the cancellation of the surgery. Accordingly, Director Caruso's is entitled to summary judgment for lack of exhaustion with respect to all claims except those arising from the alleged cancellation of the surgery in 2007.

### 3. Dr. Pandya

Plaintiff alleged that Dr. Pandya did not properly schedule the removal of a "boxing glove splint" on July 1, 2006 and then improperly relied on plaintiff's medical charts, rather than a physical examination, in determining whether the "calcium carbonate treatment" was appropriate. The only grievance which named Dr. Pandya was no. 1994 with respect to the cancellation of surgery in 2007. Plaintiff did not properly exhaust any grievance against Dr. Pandya's involvement

in the removal of the splint on July 1, 2006 or denial of the calcium carbonate treatment. *See Jones*, 549 U.S. at 218-19; *Woodford*, 548 U.S. at 90-93. Accordingly, Dr. Pandya should be granted summary judgment for lack of exhaustion.

### D. Eighth Amendment claims

### 1. Director Caruso

Director Caruso is entitled to summary judgment due to her lack of personal involvement in plaintiff's medical care, specifically the decision to cancel plaintiff's surgery. It is well settled that a § 1983 action cannot be based on a theory of respondeat superior. *See Monell*, 436 U.S. at 691; *Taylor v. Michigan Department. of Corrections*, 69 F.3d 76, 80-81 (6th Cir. 1995). A supervisor's liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act. *Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir. 1998). In order to hold a supervisor liable under § 1983, "[t]here must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). Plaintiff has not alleged any personal involvement by Director Caruso with respect to the treatment of his right pinky finger. In addition, Director Caruso states in an affidavit that she had not personal involvement in the allegations which form the basis of plaintiff's complaint. Caruso Aff. at ¶ 15 (docket no. 37-13). Thus, Director Caruso is entitled to summary judgment on plaintiff's claims.

### 2. R.N. Habtemariam

### a. Delay in treating the May 13, 2008 finger injury

Plaintiff alleged that R.N. Habtemariam chose to dispense medicine to Level VI prisoners rather than attend to his May 13, 2008 finger injury, which resulted in plaintiff waiting 1

hour and 17 minutes to receive treatment from R.N. Bates. Plaintiff alleged that he injured his finger at 2020 hours (8:20 p.m.) on May 13, 2008. Compl. at ¶ 59. Plaintiff reported the situation to the unit officer at that time. *Id.* When the unit officer contacted R.N. Habtemariam, who stated that he was running the "med lines" for level five prisoners, that his shift was about to end, and that he would not have time to treat plaintiff. *Id.* MDOC medical records reflect that plaintiff was seen by R.N. Bates at 9:39 p.m. *See* MDOC Medical Records (docket no. 44). At that time, plaintiff reported that he pinched the middle finger of his right hand between the weight bar and weights after finishing a set and while trying to set the bar down. *Id.* R.N. Bates noted the injury and treatment as follows:

> Most of the trauma is at the first knuckle of right hand middle finger. There is a laceration about 1 cm in length and of unknown depth. Also there is a +1-2 edema around the joint. Finger splint applied and taped into place to immobilize joint.

*See* docket no. 44. R.N. Bates noted that the "[s]ite was cleansed with wound cleanser related to a small amount of bleeding." *Id.* Plaintiff "did not appear very distressed and rated pain between 4-5. *Id.* In addition, plaintiff was placed on the "Add-on" list for a medical service provider the next morning. *Id.*

"[M]any federal courts have recognized, a deliberately indifferent delay in giving or obtaining treatment may also amount to a violation under the Eighth Amendment." *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001). "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson*, 503 U.S. at 9. *See, e.g., Lockett v. Suardini*, 526 F.3d 866, 876 (6th Cir. 2008) (minor cuts and bruises from an altercation do not support an Eighth Amendment claim); *Wesson v. Oglesby*, 910 F.2d 278, 284 (5th Cir. 1990) ( a

prisoner's alleged injuries of swollen wrists with some bleeding due to handcuffing "do not constitute such a 'serious medical need' that any minor delay caused by the defendants in delivering [the prisoner] to the care of medical personnel could be construed as 'deliberate indifference' "). In addition, a prisoner who claims that a delay in medical treatment amounted to an Eighth Amendment violation "must place verifying medical evidence in the record to establish the detrimental effect of the delay." *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir.2001), quoting *Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d 1176, 1188 (11th Cir. 1994).

Viewing the facts in the light most favorable to plaintiff, the court concludes that plaintiff cannot demonstrate an Eighth Amendment claim against R.N. Habtemariam with respect to the treatment of his left middle finger injury that occurred on May 13, 2008. While plaintiff's injury sustained while lifting weights was no doubt painful, the court does not view a 1 centimeter laceration and with a "small amount of bleeding" as a serious medical need for purposes of a federal constitutional violation. In addition, plaintiff has failed to present any verifying medical evidence in the record to establish the detrimental effect of the delay. A one hour and seventeen minute delay from the time that plaintiff suffered the finger injury until the time he received treatment for this type of minor injury does not form the basis for a claim of deliberate indifference. This is not a case where the prisoner suffered a heart attack, stroke, seizure or other life threatening condition which required emergency action. Most non-prisoners would consider themselves lucky to have a cut knuckle treated at a hospital, clinic or doctor's office within one hour and seventeen minutes after suffering such an injury.

Furthermore, plaintiff has failed to demonstrate the subjective element of an Eighth Amendment claim. Plaintiff's complaint alleged that R.N. Habtemariam was occupied dispensing

medication to other prisoners when the unit officer called in the injury. The allegation that R.N. Habtemariam did not immediately stop and provide treatment to plaintiff's finger injury, because he was already dispensing medication to other prisoners at that time, does not demonstrate the "obduracy and wantonness . . . that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause." *Whitley*, 475 U.S. at 319. R.N. Habtemariam's motion for summary judgment should be granted with respect to the alleged failure to treat plaintiff's left middle finger injury on May 13, 2008.

### b. Failure to provide pain medication

Finally, plaintiff alleged that R.N. Habtemariam, along with Dr. Nelson, R.N. Gregurek, R.N. Rowland, P.A. Rohrs and R.N. Bates failed to provide him with adequate pain medication in violation of the Eighth AMendment. R.N. Habtemariam's motion for summary judgment did not address this issue. Accordingly, this claim remains.

### V. Recommendation

For the reasons set forth above, I respectfully recommend that the motion to dismiss filed by Dr. Burgess (docket no. 23) be **GRANTED** and that he be dismissed from this action.

I further recommend that the motion to dismiss filed by Dr. Nelson and P.A. Rohrs, (docket no. 35), which this court construes as a motion to quash, be **GRANTED**, with leave for plaintiff to attempt valid service; specifically I recommend that the Clerk's Office re-issue the summonses to Dr. Nelson and P.A. Rohrs, and that the United States Marshals Service personally serve a copy of the summons and complaint on these two defendants.

I further recommend that the motion for summary judgment filed by Director Caruso Dr. Pandya and Warden Prelesnik (docket no. 36) be **GRANTED** and that they be dismissed from this action.

I further recommend that the motion for summary judgment filed by R.N. Habtemariam (docket no. 36) be **GRANTED**, but only as to the claim that there was a delay in treating plaintiff's May 13, 2008 injury, and that this claim be dismissed.

I further recommend that the motion to dismiss filed by CMS (docket no. 45) be **GRANTED** and that CMS be dismissed from this action.

Dated:  July 28, 2010                          /s/ Hugh W. Brenneman, Jr.
                                               HUGH W. BRENNEMAN, JR.
                                               United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).