UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PRESTON PORTIS, JR.,

        Plaintiff,

Case No. 1:09-cv-846

Hon. Robert J. Jonker

vs.

PATRICIA CARUSO, *et al.*,

        Defendants.
_____/

**REPORT AND RECOMMENDATION**

This is a civil rights action brought by a former state prisoner pursuant to 42 U.S.C. § 1983.[1]  This matter is now before the court on defendants Dr. William Nelson and PA Donna Rohrs' motion for summary judgment (docket no. 136).  Defendants' motion is unopposed.

**I.**      **Background**

Plaintiff's action arises from alleged inadequate medical care for an injury to the fifth digit of his right hand (pinky finger) which occurred while playing softball at the Michigan Training Unit (MTU) on June 30, 2006 and for an injury to the third finger of his right hand (middle finger) which occurred while lifting weights at Ionia Maximum Correctional Facility (ICF) on May 13, 2008.  Plaintiff's complaint named 13 defendants and sought over two million dollars in damages.  Dr. Nelson and PA Rohrs are the sole remaining defendants.

The claims against Dr. Nelson and PA Rohrs involve the treatment of both injuries.  The court previously summarized plaintiff's allegations as follows:

---

[1] It appears that plaintiff was paroled on or about January 11, 2011.  *See* Plaintiff's Change of Address (docket no. 91); Michigan Department of Corrections Offender Tracking Information System (OTIS) at www.michigan.gov/corrections (biographical information for Preston Portis, Jr. No. 191775).

### 1. The first injury in 2006

"On the 30th day of June 2006, while playing softball at MTU, plaintiff's small finger, 5th digit, was struck by the ball and his finger became immediately swollen, with a bone dislocated, pushing against the skin near the first joint of the finger causing significant bleeding and pain." Compl. at ¶ 16 (docket no. 1). Nurse Julie Flecther [sic] of the MTU Health Services determined that plaintiff had an emergency due to the swollen finger and plaintiff's "accelerated vital signs" and sent plaintiff to the control center for transportation to the hospital (ICMH). *Id.* at ¶ 17. The Control Center Sgt. Czech determined that plaintiff could ride with another prisoner to ICMH. *Id.* at ¶ 18. After one hour it was determined that the other prisoner did not require emergency treatment, so plaintiff was transported to ICMH. *Id.* The attending physician at ICMH "was aware plaintiff required surgery to repair his finger but elected not to treat these aspects of plaintiff's injuries." *Id.* at ¶ 23. As a result, the tendon and ligament in plaintiff's finger have never been surgically repaired "resulting in a permanent gross deformity, [loss] of considerable dexterity and substantial pain." *Id.* Dr. Iqbal provided specific instructions to MTU Health Services, "i.e., to remove the boxing glove splint the following day 7/1/06, replace with a regular splint, and check finger coloration." *Id.* at ¶ 25. Dr. Iqbal also determined that plaintiff "should be examined at his office, within 8 to 10 days, to ascertain the extent of surgery necessary for 'need to open repair, need for repair of the center clip of the extensor tendon or partial rupture of the radial collatera ligament might arise later on [sic].'" *Id.* at ¶ 27. The splint was removed seven days later (July 6th), but a regular splint was not placed on the finger until July 7th. *Id.* at ¶ 32. R.N. Sherri Gregurek recorded Dr. Iqbal's instructions but did not schedule plaintiff for a health care appointment to remove the boxing glove splint, monitor coloration, circulation and pain. *Id.* at ¶ 26. Defendants Dr. Pandya, R.N. Gregurek, R.N. Rowland and P.A. Rohrs' failure to schedule a follow-up appointment or to follow Dr. Iqbal's orders to change the splint and check circulation caused plaintiff's finger to be permanently deformed, lose dexterity and be painful. *Id.* at ¶ 29.

Due to plaintiff's complaints of pain, P.A. Rohrs ordered x-rays to be taken on August 31, 2006. *Id.* at ¶ 33. At that time, Rohrs noted "the presence of an avulsion fracture and soft tissue swelling" but "did nothing to treat the injured finger." *Id.* After plaintiff made continued complaints of "pain, deformity and lost [sic] of dexterity," P.A. Rohrs ordered another x-ray, taken on September 29, 2006, and ordered calcium carbonate treatment after "arriving at the identical conclusion." *Id.* at ¶ 34. Because the calcium carbonate treatment is not part of CMS' formulary, Dr. Pandya had to approve the medication. *Id.* at ¶ 35. Dr. Pandya denied the formulary, without examining plaintiff's hand, relying "upon the paperwork submitted" which was "in error or had not reflected an accurate and real time [diagnosis]." *Id.* at ¶ 36. Under these circumstances, CMS' procedure was "constitutionally flawed because it evolved into a reckless disregard and medical deliberate indifference to a medical need." *Id.* Dr. Pandya knew or should have

known that the rupture and ligament damage required surgery, based upon Dr. Iqbal's initial diagnosis, and should have "ordered timely and adequate medical care for plaintiff's injury." *Id.* at ¶ 37. CMS knew or should have known that it had not provided adequate health care personnel which resulted in untimely and inadequate treatment for plaintiff's injury. *Id.* at ¶ 38. In addition, CMS did not make an appointment with a hand specialist until approximately 4 1/2 months after the injury. *Id.* at ¶ 40.

\* \* \*

### 2. The transfer to ICF

Plaintiff alleged that he filed grievances regarding the inadequate health services. *Id.* at ¶¶ 49-50. MTU Warden Prelesnik addressed one of plaintiff's grievances and "upon answering plaintiff's grievance, plaintiff was transferred from MTU to ICF." *Id.* at ¶ 51. Plaintiff asserts that this transfer was in violation of his First and Fourteenth Amendment right to petition the government to air grievances. *Id.* at ¶¶ 52-57.

### 3. The second injury in 2008

On May 13, 2008, plaintiff injured the third digit on his right hand while lifting weights. *Id.* at ¶ 58. Plaintiff believes that this injury, which he refers to as an accident, "was due to the prior injury of the fifth digit on the right hand which rendered his right hand considerable weaker [sic]." *Id.* When plaintiff contacted the unit officer at 20:20 hours (8:20 p.m.) about the injury, R.N. Habtemariam advised the officer that he was running the med lines for level five prisoners, that his shift was about to end, that he did not have time to treat plaintiff and that plaintiff should wait until the next day for treatment. *Id.* at ¶ 59. Plaintiff was not seen until 21:37 hours (9:37 p.m.) (i.e., 1 hour and 17 minutes later) when R.N. Bates had plaintiff escorted to health services from the housing unit. *Id.* at ¶ 61. Plaintiff saw R.N. Habtemariam at health services at that time "not running a med line and not on his way out the building." *Id.* at ¶ 62. As a result of the weight lifting injury, plaintiff sustained a five centimeter cut and lost a considerable amount of blood. *Id.* at ¶ 63. R.N. Bates cleaned the wound, placed a dressing and splint on the wound and told plaintiff that he would be seen by the doctor the next morning. *Id.* Plaintiff asserts that Bates was "covering up" for Habtemariam's "unprofessional behavior" and did not use sutures to close the wound. *Id.* at ¶ 64.

Plaintiff was not called to health services the next day, so he had the unit officer call R.N. Bates to dress his injury. *Id.* at ¶ 65. R.N. Bates placed plaintiff on health services call-out for x-rays on May 15, 2008. *Id.* at ¶ 66. After having the x-rays taken, plaintiff asked defendant Dr. Nelson why he had not been placed on call

3

to examine the injury. *Id.* Dr. Nelson replied that he had read the report and subsequently examined the injury. *Id.* The doctor determined that the laceration required two stitches, but due to the time lapse (two days) placed butterfly band aids on the wound to close it. *Id.* at ¶ 67. The x-rays did not show an abnormality according to the radiologist, but Dr. Nelson read the x-ray and observed bone fragments. *Id.* at ¶ 68. By May 17, 2008, Dr. Nelson knew or should have known that plaintiff's finger had torn tendons and ligament damage which required surgery. *Id.* at ¶ 69. Nine months after plaintiff suffered the injury, Dr. Nelson referred him to a hand specialist, Dr. Mark R. DeHaan, who determined in February of 2009 that plaintiff required surgery to repair the tendon and ligament damage. *Id.* at ¶ 76.

### 4.     Pain medication

Plaintiff alleged that the Tylenol prescribed did not adequately address the pain he experienced and made repeated requests for stronger pain medication to defendants Dr. Nelson, R.N. Gregurek, R.N. Rowland, P.A. Rohrs, R.N. Habtemariam and R.N. Bates. *Id.* at ¶ 71. Plaintiff made requests in May, June and July of 2008 and January of 2009. *Id.* at ¶¶ 71-74.

Report and Recommendation at pp. 2-6 (July 28, 2010) (docket no. 60).

With respect to PA Rohrs, plaintiff contends: that PA Rohrs (along with defendants Dr. Pandya, RN Gregurik and RN Rowland) failed to schedule an appointment for July 1, 2006, to have the boxing glove splint removed and a regular splint placed on it (Compl. at ¶ 29); that while PA Rohrs ordered an x-ray of his injured finger on August 31, 2006, she failed to treat it (*id.* at ¶ 33); and that years later PA Rohrs failed to prescribe adequate pain medication on various dates (May 8 and 30, 2008; June 6, 9 and 20, 2008; July 7, 2008; and January 20 and 26, 2009) (*id.* at ¶ 71).

With respect to Dr. Nelson, plaintiff contends: that the doctor examined the injury and concluded that the laceration required sutures and that due to the time lapse of two days, butterfly band aids were placed on the wound (*id.* at ¶ 67); that as early as May 17, 2008, the doctor knew or should have known that plaintiff's finger had damage requiring surgery (*id.* at ¶ 69); that the doctor prescribed Tylenol which "was inadequate to halt the pain" (*id.* at ¶ 70); that the doctor

4

failed to prescribe adequate pain medication on the dates alleged as to PA Rohrs (*id.* at ¶ 71); and that the doctor subsequently referred plaintiff to a hand specialist for surgery (*id.* at ¶ 76).

### III. Defendants' motion for summary judgment

#### A. Legal Standard

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Here, defendants' motions are unopposed. "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2nd Cir. 1996). However, when a motion for summary judgment is unopposed, "[n]othing in either the Rules or case law supports an argument that the trial court must conduct its own probing investigation of the record" to demonstrate the existence of genuine issues of material fact. *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 405 (6th Cir. 1992).

### B.  Lack of exhaustion as to defendant PA Rohrs

The PLRA, 42 U.S.C. § 1997e, provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A

prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741. One reason for creating prisoner grievance procedures under the PLRA was to create an administrative record for the court.

> Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record.

*Jones v. Bock*, 549 U.S. 199, 204 (2007). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Id.* at 218; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218.

The MDOC requires prisoners to follow a three-step process to exhaust grievances. *See* Policy Directive 03.02.130 (effective July 9, 2007). A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the grieveable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ P. If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff. *Id.* at ¶¶ P and R. The Policy Directive provides the following directions for completing grievance forms:

> The issues shall be stated briefly but concisely. Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ R (emphasis in original). The prisoner must send the Step I grievance to the appropriate grievance coordinator. *Id.* at ¶ V. If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator. *Id.* at ¶ BB. Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the Grievance and Appeals Section. *Id.* at ¶ FF.

PA Rohr's interaction with plaintiff occurred at MTU. The court previously determined that plaintiff exhausted four grievances at MTU:

> The record reflects that plaintiff filed four grievances exhausted through Step III while incarcerated at MTU: MTU-2006-04-514-08h ("514"); MTU-2006-05-598-17a ("598"); MTU-2006-04-533-23z ("533"); and MTU-2006-07-835-27b ("835"). *See* Exhs. B, C, D and E attached to CMS' Brief (docket nos. 45-4, 45-5, 45-6 and 45-7). The first three grievances do not relate to health care issues (no. 514 grieves the calculation of plaintiff's sentence; no. 598 grieves the school principal for not allowing him to use the restroom; and no. 533 grieves that his telephone list is not being properly maintained). The only grievance that arguably pertains to plaintiff's claims is no. 835, which complains that certain members of the correctional facility's staff took too long to take him to the hospital when he injured his finger on June 30, 2006.

Report and Recommendation at pp. 11-12 (docket no. 60).

PA Rohrs is not named in grievance no. 835, which is the only grievance relevant to plaintiff's claim. For this reason, plaintiff has not properly exhausted a grievance against Rohrs with respect to his claims arising from the June 30, 2006 injury sustained at MTU. *See Jones*, 549 U.S. at 218; *Woodford*, 548 U.S. at 90-91. Accordingly, PA Rohrs is entitled to summary judgment for lack of exhaustion.

## C. Deliberate indifference as to Dr. Nelson

Defendant Dr. Nelson moves for summary judgment on grounds that his treatment of plaintiff did not amount to deliberate indifference. It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (l976). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Hudson*, 503 U.S. at 8-9. With respect to the infliction of serious pain, courts recognize that "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* at 8 (internal citations and quotation marks omitted). Similarly, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation.  *Id.* at 835.  Thus,

> a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle*, 429 U.S. at 106.

"[A] plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). *See Clemmons v. Bohannon*, 956 F.2d 1523, 1529 (10th Cir. 1992) ("the Eighth Amendment does not apply to claims based on inadvertent failure to provide adequate care, negligent misdiagnosis, or an inmate's difference of opinion with medical personnel regarding diagnosis or treatment"). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

Defendant Dr. Nelson has presented little evidence in support of his claim for summary judgment.  However, a lack of supporting evidence is not fatal to a motion for summary judgment.  "The moving party need not support its motion with evidence disproving the nonmoving party's claim." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  Rather, the moving party only needs to "point[ ] out to the district court - that there is an absence of evidence to support the nonmoving party's case." *Id.,* quoting *Celotex Corporation v. Catrett*, 477 U.S. 317, 325 (1986).

Here, defendant has produced two medical records which reflect Dr. Nelson's involvement with plaintiff. First, plaintiff submitted a health care request dated June 6, 2008, in which plaintiff referred to his finger pain and the need for stronger medication. In his response to the health request, Dr. Nelson stated: that plaintiff's x-ray was reviewed; that there was no fracture or chip of the bones, and that his pain was likely from spraining of the ligaments. *See* Health Care Request (June 6, 2008) (docket no. 136-3). Second, Dr. Nelson submitted a copy of a radiology report from Michael A. Henderson, D.O., which he (Dr. Nelson) had ordered. Radiology Report (July 21, 2008) (docket no. 136-4). The report stated: that there was no evidence of an acute displaced fracture or other acute osseous abnormalities; and that early arthritic changes were noted at the proximal and middle phalangeal joint. *Id.* Dr. Henderson concluded "[n]o acute findings are seen to involve the 3rd digit right hand." *Id.* These uncontested records demonstrate that Dr. Nelson was monitoring plaintiff's injury. In his complaint, plaintiff admitted that Dr. Nelson prescribed pain medication and that the doctor also referred him to a hand specialist for surgery. *See* Compl. at ¶¶ 70 and 76.

Plaintiff's bare allegations that Dr. Nelson the doctor did not prescribe additional pain medication and delayed in referring plaintiff for surgery are not sufficient to establish a claim for deliberate indifference. *Id.* at ¶¶ 70-71. In his complaint, plaintiff admits that Dr. Nelson provided him with treatment for his injured finger. The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments

11

and to constitutionalize claims which sound in state tort law." *Id. See Owens v. Hutchinson*, 79 Fed. Appx. 159, 161 (6th Cir. 2003) ("[a] patient's disagreement with his physicians over the proper medical treatment alleges no more than a medical malpractice claim, which is a tort actionable in state court, but is not cognizable as a federal constitutional claim"). *See also*, *Woodberry v. Simmons*, 146 Fed.Appx. 976, 977 (10th Cir. 2005) ("a difference of opinion between a prisoner and the prison medical staff about medical treatment does not constitute deliberate indifference"). Defendant Dr. Nelson is also entitled to summary judgment.

### IV.     Recommendation

For the reasons set forth above, I respectfully recommend that defendants Dr. William Nelson and PA Donna Rohrs' motion for summary judgment (docket no. 136) be **GRANTED** and that this action be **DISMISSED**.


Dated:  November 5, 2012                                       /s/ Hugh W. Brenneman, Jr.
                                                               HUGH W. BRENNEMAN, JR.
                                                               United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).